Slip Op. 15-21

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **TAI SHAN CITY KAM KIU ALUMINIUM EXTRUSION CO. LTD.,**<br><br>　　　　**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>　　　　**Defendant,**<br><br>**ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,**<br><br>　　　　**Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 14-00016** |

## OPINION AND ORDER

[Remanding Commerce's determination issued in the final results of the countervailing duty administrative review covering aluminum extrusions from China for Commerce to corroborate Plaintiff's rate.]

Dated: March 20, 2015

William Ellis Perry, Dorsey & Whitney, LLP, of Seattle, WA, argued for plaintiff. With him on the brief was Emily Lawson.

Tara Kathleen Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Joyce R. Branda, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of Counsel on the brief was Jessica Marie Link, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Alan H. Price and Robert E. DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor.

　　　Kelly, Judge: This matter is before the court on Plaintiff's, Tai Shan City Kam Kiu

Aluminium Extrusion Co. Ltd., ("Kam Kiu" or "Plaintiff"), USCIT Rule 56.2 motion for

judgment on the agency record challenging the United States Department of Commerce's

("Commerce") administrative review of the countervailing duty order covering certain

aluminum extrusions from the People's Republic of China ("PRC").  See Aluminum

Extrusions From the People's Republic of China, 79 Fed. Reg. 106 (Dep't Commerce

Jan. 2, 2014) (final results of countervailing duty administrative review; 2010 and 2011)

("Final Results"); see also Aluminum Extrusions From the People's Republic of China, 76

Fed. Reg. 30653 (Dep't Commerce May 26, 2011) (countervailing duty order).  Kam Kiu

commenced this action, pursuant to section 516A of the Tariff Act of 1930 ("Tariff Act" or

the "Act"), as amended, 19 U.S.C. § 1516a (2012),[1] to challenge Commerce's use of

adverse facts available ("AFA") in calculating Kam Kiu's rate.[2]  Defendant, United States,

and Defendant-Intervenor, Aluminum Extrusions Fair Trade Committee, oppose this

motion.  Kam Kiu argues that Commerce abused its discretion by not considering Kam

Kiu's quantity and value ("Q&V") submission, and, as a result, applying a rate based on

facts available with an adverse inference.  Alternatively, Kam Kiu argues that the rate

Commerce calculated for Kam Kiu was not supported by substantial evidence or in

accordance with law.  For the following reasons, Commerce acted reasonably and within

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition, and all applicable supplements.

[2] While the statute provides separately for the use of facts otherwise available and the subsequent application of an adverse inference regarding those facts, Commerce uses the term "total adverse facts available rate", "AFA rate", or "total AFA rate", to refer a rate resulting from the application of the "facts otherwise available" and "adverse inferences" provisions of 19 U.S.C. § 1677e.  See e.g., Decision Memo 8 (explaining "the Department's approach in recent CVD investigations and reviews" for calculating "total AFA rate for non-cooperative companies").

its discretion in disregarding late submitted information, using facts otherwise available and applying an adverse inference to Kam Kiu.  However, Commerce's AFA rate as applied to Kam Kiu is unsupported by substantial evidence because Commerce failed to corroborate the rate.

## BACKGROUND

Kam Kiu is a Chinese producer and exporter of aluminum extrusions that are subject to the countervailing duty order in question.   On May 1, 2012, Commerce published a notice of opportunity to request an administrative review for the first review period, September 7, 2010 through December 31, 2011. Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 77 Fed. Reg. 25679, 25680 (Dep't Commerce May 1, 2012) (opportunity to request administrative review).  A U.S. importer, MacLean Power Systems, a subsidiary of MacLean-Fogg Company (collectively, "MacLean-Fogg"), timely requested a review of its imports from Kam Kiu on May 30, 2012 and certified that it had served a copy of its review request on Kam Kiu.  See MacLean-Fogg Letter Requesting Review of Kam Kiu 1-2, PD 37 at bar code 3078655-01 (May 31, 2012); see also Issuance of Quantity and Value Questionnaire 2, PD 127 at bar code 3099325-01 (Oct. 1, 2012).  Thereafter, Commerce initiated the first administrative review on July 12, 2012, for 67 companies, including Kam Kiu, and published notice in the Federal Register. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 77 Fed. Reg. 40565, 40566-73 (Dep't Commerce July 10, 2012).

In selecting mandatory respondents, Commerce determined to limit the number of respondents it would review by choosing companies that accounted for the largest volume of subject merchandise.  See CBP Query Results Memorandum 1-2, PD 92 at bar code 3097282-01 (Sept. 18, 2012).   After identifying inconsistencies in the CBP database, which Commerce used to identify potential mandatory respondents, Commerce determined not to rely solely on the CBP query results to select mandatory respondents. Id. at 2.  Instead, Commerce issued Q&V questionnaires to each company that had been identified in the CBP data query.  See id.; see generally CBP Query Results Data, PD 93 at bar code 3097282-02 (Sept. 18, 2012).  Kam Kiu was not listed in the CBP query results but MacLean-Fogg submitted an entry form showing an entry from Kam Kiu and certified that it had served a copy of the letter on Kam Kiu.  See MacLean-Fogg Letter Pertaining to Entry from Kam Kiu, PD 111 at bar code 3098593-01, CD 18 at bar code 3098573-01 (Sept. 25, 2012).

On October 1, 2012, Commerce sent a Q&V questionnaire to Kam Kiu via UPS, which set a deadline to respond by October 18, 2012.  See Issuance of Quantity and Value Questionnaire 2, Att. Q&V Questionnaire, PD 127 at bar code 3099325-01 (Oct. 1, 2012).  Commerce notified MacLean-Fogg's counsel by telephone that it had issued the questionnaire to Kam Kiu.  See Memorandum Re Contacting Potential Respondents 2, PD 131 at bar code 3099979-01 (Oct. 4, 2012).  Kam Kiu and two other companies which had been sent questionnaires did not file responses within the October 18, 2012 deadline.

On June 3, 2012, seven days before the preliminary results were published, Kam Kiu submitted its Q&V response and explained that MacLean-Fogg never informed it that

a review had been requested, nor did Kam Kiu's management realize that it had received a Q&V questionnaire. See generally Kam Kiu Q&V Questionnaire Response, PD 356 at bar code 3138491-01 (June 3, 2013); see also Issues and Decision Memorandum for Aluminum Extrusions from the People's Republic of China 111, C-570-968, (Dec. 26, 2013), available at http://enforcement.trade.gov/frn/summary/prc/2013-31407-1.pdf (last visited Mar. 11, 2015) ("Decision Memo").  Commerce treated Kam Kiu as uncooperative for the Preliminary Results.  Aluminum Extrusions From the People's Republic of China, 78 Fed. Reg. 34649, 34650 (Dep't Commerce June 10, 2013) (preliminary results of countervailing duty administrative review; 2010 and 2011) ("Preliminary Results"). Despite arguments contained in Kam Kiu's late submission and in its case brief, Commerce continued to find Kam Kiu uncooperative in the Final Results and assigned Kam Kiu a 121.22% rate based on facts otherwise available with an adverse inference. Final Results at 107.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012), and 19 U.S.C. § 1516a(a). "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.  **Commerce did not act unreasonably or abuse its discretion by disregarding Kam Kiu's Q&V submission and assigning a rate based on AFA to Kam Kiu.**

Commerce initiates administrative reviews of countervailing duty orders, at least once every 12 months, if it receives a request for a review.  See 19 U.S.C. § 1675(a)(1)(A).  In general, in order to determine rates under §1675(a), Commerce is directed to "determine an individual countervailable subsidy rate for each known exporter or producer of the subject merchandise."  19 U.S.C. § 1677f-1(e)(1).  However, where Commerce "determines that it is not practicable to determine individual countervailable subsidy rates . . . because of the large number of exporters or producers involved in the investigation or review," Commerce may "determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to" a statistically valid sample of exporters or producers or to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that [Commerce] determines can be reasonably examined."  19 U.S.C. § 1677f-1(e)(2)(A)(i)-(ii).  Alternatively, Commerce may "determine a single country-wide subsidy rate to be applied to all exporters and producers."  19 U.S.C. § 1677f-1(e)(2)(B).  Additionally, if Commerce limits its examination pursuant to 19 U.S.C. § 1677f-1(e)(2)(A), the statute requires Commerce to use the individually calculated rates "to determine the all-others rate under section 1671d(c)(5) . . . ."  19 U.S.C. § 1677f-1(e).

In order to select mandatory respondents from exporters or producers accounting for the largest volume under 19 U.S.C. § 1677f-1(e)(2)(A)(ii), Commerce relies on

information from CBP Query Results and, where the results are unreliable, Q&V questionnaire responses.  See e.g., CBP Query Results Memorandum 2, PD 92 at bar code 3097282-01 (Sept. 18, 2012).  Because there are strict statutory deadlines for completing administrative reviews on countervailing duty orders, see 19 U.S.C. § 1675(a)(3), Commerce sets deadlines for parties to submit their Q&V questionnaire responses.  See Issuance of Quantity and Value Questionnaire, PD 127 at bar code 3099325-01 (Oct. 1, 2012).

Moreover, Commerce has discretion to use facts otherwise available to make determinations under certain circumstances.  See 19 U.S.C. § 1677e.  More specifically, where "necessary information is not available on the record," or a party "withholds information that has been requested by [Commerce] . . . [or] significantly impedes a proceeding . . . [Commerce] . . . shall, subject to section 1677m(d) . . . use the facts otherwise available in reaching the applicable determination . . . ."  19 U.S.C. § 1677e(a).  If Commerce additionally "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce] . . . [Commerce] . . . , in reaching the applicable determination . . . may use an inference that is adverse to the interests of the party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b).

Under the foregoing statutory framework, Commerce's determination to use facts otherwise available and apply an adverse inference was both reasonable and within its discretion.  Consistent with its authority to individually review fewer than all exporters or producers, Commerce issued Q&V questionnaires to companies in order to aid its

selection of the mandatory respondents in this countervailing duty review. <u>See</u> CBP Query Results Memorandum 2, PD 92 at bar code 3097282-01 (Sept. 18, 2012).   The Q&V questionnaires, which require companies to detail their sales, were issued on October 1, 2012, and the deadline for responses was October 18, 2012. <u>See</u> Issuance of Quantity and Value Questionnaire Att. Q&V Questionnaire, PD 127 at bar code 3099325-01 (Oct. 1, 2012).  While the questionnaires clearly explained "that due to time constraints in this administrative review, the Department does not intend to extend the deadline for responding to the attached Quantity and Value Questionnaire," <u>id.</u> at 1, Kam Kiu filed its Q&V questionnaire response with Commerce on June 3, 2013, over seven months late and on the day Commerce signed the preliminary results. <u>See</u> <u>Decision Memo</u> 111.

Using the Q&V questionnaire responses, Commerce selected the mandatory respondents in early November 2012, a decision that informed Commerce's entire administrative review.   Respondent Selection Memorandum, PD 206 at bar code 3104450-01 (Nov. 5, 2012).  Commerce's administrative process in this countervailing duty review could be compromised if it had to consider the late-filed response to its Q&V questionnaire in selecting mandatory respondents.   Further, requiring Commerce to consider the late-filed response without using facts available or adverse inferences would undermine the integrity of the procedures Commerce has put in place and the system itself.  A respondent could simply choose not to submit a Q&V questionnaire response if it wished to avoid being selected as a mandatory respondent in the hopes it might obtain a more favorable rate.   Allowing the respondents to opt out of compliance with

Commerce's request in such a fashion would run counter to the purpose of providing Commerce with the discretion to impose adverse inferences, see Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-465, vol. 1, at 869070 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ("SAA"), and would affect Commerce's ability to conduct administrative reviews.   To combat such a strategy, Commerce would have to restart its respondent selection process each time a respondent submitted Q&V information late, or, as in this case, after signing the preliminary results. Such a systemic burden outweighs any potential benefit to Kam Kiu.  The court finds that Commerce acted reasonably and did not abuse its discretion.

Kam Kiu's arguments to the contrary are unpersuasive.  Kam Kiu sets forth the circumstances which it claims led it to miss the deadline for submitting the Q&V questionnaire response.  Kam Kiu points to an affidavit from its Chief Marketing Officer explaining that although Kam Kiu technically received the questionnaire, it was not aware of it because the questionnaire was not addressed to anyone in particular. See Kam Kiu Q&V Questionnaire Response Att. 2, PD 356 at bar code 3138491-01 (June 3, 2013). According to Kam Kiu, due to the lack of a specific addressee, the questionnaire was placed with "promotion materials" that Kam Kiu receives, so no one realized its significance.  Id.  Kam Kiu claimed that only after Kam Kiu's attorney alerted the company to the questionnaire and the following "intensive search" did Kam Kiu discover the questionnaire and submit its response.  Id.

The reasons Kam Kiu provides for failing to timely respond demonstrates that it did not act to the best of its ability.  All of Kam Kiu's justifications revolve around its lack

of awareness of both the administrative review and the undiscovered Q&V questionnaire. See e.g., Kam Kiu's Administrative Case Brief 2-3, PD 414 at bar code 3147136-01 (July 26, 2013); Mem. P. & A. Supp. Pl.'s Mot. Summ. J. Agency R. 3, Sep. 3, 2014, ECF No. 36 ("Pl.'s Mem."). Kam Kiu failed to cooperate because it did not have procedures in place to ensure that it could comply with Commerce's requests. Kam Kiu's failure to maintain adequate procedures cannot excuse its inaction here. See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Commerce regularly uses Q&V questionnaires in order to determine mandatory respondents. See Def.'s Resp. 3. Furthermore, Kam Kiu has participated in other administrative proceedings. See Def.'s Resp. 10. It was aware that Commerce could send a Q&V questionnaire through the mail, and therefore Kam Kiu should have had procedures in place to timely locate and respond to materials from Commerce.

Moreover, the Q&V questionnaire was not the only notice that Commerce provided. Commerce published notice of the initiation in the Federal Register specifically identifying Kam Kiu. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 77 Fed. Reg. 40565, 40566-73 (Dep't Commerce July 10, 2012). Moreover, MacLean-Fogg certified that it had served a copy of its request for review on Kam Kiu. See MacLean-Fogg Letter Requesting Review of Kam Kiu, PD 37 at bar code 3078655-01 (May 31, 2012). On these facts, the court cannot say that Commerce abused its discretion or acted unreasonably in disregarding the untimely filed Q&V questionnaire response.

Kam Kiu relies heavily on Grobest & I-Mei Indust. (Vietnam) Co. v. United States, 36 CIT__, 815 F. Supp. 2d 1342 (2012), to argue that the court should find Commerce abused its discretion here.  There, the court found that Commerce abused its discretion by rejecting a respondent's separate rate certification ("SRC") and applying the NME-wide rate.  Id. at 1365.  In that case, a number of facts informed the court's decision, including: the margin assigned to respondent was likely inaccurate; Commerce found in the investigation and prior two reviews that the same respondent was separate; the rejected certification continued to show respondent was separate; the burden on Commerce would likely have been minimal as Commerce did not need further inquiry beyond the certification in the past two reviews; the untimely certification was submitted seven months prior to the preliminary results and a year before the final results; and, the respondent was diligent in seeking to correct the omission.  See id. at 1364-66.

The facts and circumstances that led the Grobest court to find an abuse of discretion are highly distinguishable from those set forth by Kam Kiu.  Kam Kiu submitted its Q&V questionnaire response much later in the proceeding than the untimely filed SRC in Grobest.  Further, as Commerce explains, the failure to timely file a Q&V questionnaire response places a great burden on the mandatory respondent selection process, which in turn has implications for calculating the all-others rate.  See Decision Memo 111.  The court simply cannot equate this burden with the minimal burden the court found was imposed on Commerce in Grobest.  Grobest, 815 F. Supp. 2d at 1366-67.

Kam Kiu also argues that Commerce acted arbitrarily in applying a rate based on facts otherwise available and adverse inferences to Kam Kiu when it applied the all-others

rate to several voluntary respondents who it claims were similarly situated.   While Commerce cannot treat similarly situated parties differently without adequate explanation, see e.g., SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed.Cir. 2001), Kam Kiu and the nine respondents that had their late responses accepted and considered are not similarly situated.   Kam Kiu was not a voluntary respondent; it was specifically asked for the information contained in the Q&V questionnaire.  See Issuance of Quantity and Value Questionnaire 2, PD 127 at bar code 3099325-01 (Oct. 1, 2012).   Kam Kiu's situation differed from the voluntary respondents. The issue is not when a given respondent submits its Q&V response, but rather, whether a respondent has met its obligation to comply with a request for information.   Kam Kiu's obligation was to comply with Commerce's request for information to the best of its ability, while the voluntary respondents had no such obligation.   Kam Kiu failed to meet its obligation.   Thus, Commerce did not act arbitrarily or abuse its discretion by finding Kam Kiu uncooperative.

Instead, Kam Kiu most resembles the two other respondents that failed to submit their Q&V questionnaire responses by Commerce's deadline.   Those parties were also assigned AFA rates.  Decision Memo 7.  Kam Kiu asserts that it is not similarly situated because those companies did not submit any Q&V questionnaire responses at all, while Kam Kiu merely filed a late response.  Reply Brief Supp. Pl.'s Rule 56.2 Mot. J. Agency R. 5, Dec. 3, 2014, ECF No. 44 ("Pl.'s Reply").  This argument, again, draws an incorrect comparison.   The proper consideration here is whether respondents complied with Commerce's request for information. 19 U.S.C. § 1677e(b).  Both Kam Kiu and the two respondents who never submitted responses failed to comply with Commerce's deadline,

and thus were uncooperative.  The fact that Kam Kiu submitted its response over seven months late, on the signature day for the preliminary results, instead of not responding at all, does not undercut Commerce's findings that Kam Kiu withheld information that was requested, significantly impeded the proceeding, and failed to cooperate by not acting to the best of its ability to comply with a request for information.  <u>See</u> 19 U.S.C. § 1677e(a)(2)-(b).

Kam Kiu further argues that Commerce erred when applying facts otherwise available, as the late-filed Q&V questionnaire response was not rejected but placed on the record.  Pl.'s Reply 3 n.3.  Kam Kiu asserts that because the Q&V response is on the record despite being untimely, Commerce must consider it.  Pl.'s Reply 3-4 n.3.  However, the statute permits Commerce to disregard information that does not meet its requirements, even if it remains on the record. 19 U.S.C. § 1677e(a).  The statute allows Commerce to fill gaps in the record with facts otherwise available and to apply an adverse inference where Commerce makes the requisite findings.  <u>See</u> 19 U.S.C. § 1677e(a)(2)(A)-(C).  Commerce did not have to consider the response when determining whether to use facts otherwise available, even though the response remained on the record.

## II.   Commerce failed to corroborate Kam Kiu's AFA rate to the extent practicable.

Commerce must, to the extent practicable, corroborate an AFA rate and its failure to do so in this case renders its determination unsupported by substantial evidence. Specifically, "[w]hen [Commerce] relies on secondary information rather than on

information obtained in the course of an investigation or review, [Commerce] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c).  "Secondary information" includes information derived from "[t]he petition; [a] final determination in a countervailing duty investigation or antidumping investigation; [a]ny previous administrative review, new shipper review, expedited antidumping review, section 753 review or section 762 review." 19 C.F.R. § 351.308(c)(1)(i)-(iii) (2014).[3]  "Independent sources" include, but are not limited to, "published price lists, official import statistics and customs data, and information obtained from interested parties during the instant investigation or review."  19 C.F.R. § 351.308(d).

To corroborate, means Commerce "will examine whether the secondary information to be used has probative value." 19 C.F.R. § 351.308(d); see also SAA at 4199.  To determine that the secondary information has probative value, Commerce examines the reliability and relevance of the secondary information.  See Decision Memo 9.

Accordingly, although Commerce has broad discretion to employ adverse inferences to ensure that an uncooperative party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully, see SAA at 4198-99, the Court of Appeals has explained that "Congress could not have intended for Commerce's discretion

---

[3] Further citations to Title 19 of the Code of Federal Regulations are to the 2014 edition, for which all cited regulations are substantively identical to the 2012 and 2013 editions.

to include the ability to select unreasonably high rates with no relationship to the respondent's actual [net countervailable subsidy rate]." F. Ili De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).[4]   Instead, Commerce must assign rates that are "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." F. Ili De Cecco, 216 F.3d at 1032; see also Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (explaining that Congress tempered the deterrent purpose of using 19 U.S.C. § 1677e(a)-(b) with the corroboration requirement).

Moreover, the corroboration requirement helps to maintain the somewhat contradictory purposes of the antidumping and countervailing duty statutes as a whole (i.e., remedial not punitive) and the adverse inference section of the statute (i.e., deterrence).   If Commerce does not corroborate to the extent practicable, questions arise about whether the rate applied is punitive.

Kam Kiu specifically argues that Commerce unlawfully assigned rates from location specific subsidy programs spanning across the entire PRC and one program Kam Kiu claims was plainly not for the industry within which Kam Kiu operates.   Kam Kiu further argues that applying all the rates resulted in a rate that was unsupported by

_____

[4] Many of the cases relied upon by both parties deal with 19 U.S.C. § 1677e in the antidumping duty context.   In recent decisions dealing with 19 U.S.C. § 1677e in the countervailing duty context, the Court of Appeals and this Court have continued to cite these cases as precedent and thus the court will rely on them as well.   See e.g., Essar Steel, Ltd. v. United States, 753 F.3d 1368, 1373 (Fed. Cir. 2014).

substantial evidence and punitive.  Commerce asserts that it has corroborated the AFA

rate for Kam Kiu to the extent practicable.

Commerce's AFA methodology has two parts.   First, Commerce identifies all

subsidies from which Kam Kiu could conceivably have benefited.   Second, it assumes

that Kam Kiu, in fact, could have benefited from all of these subsidies simultaneously.

Specifically, Commerce explains that it

> computes the total AFA rate for non-cooperative companies generally using
> program-specific rates calculated for the cooperating respondents in the
> instant review or in prior segments of the instant proceeding, or calculated
> in prior CVD cases involving the country under review (in this case, the
> PRC), unless it is clear that the industry in which the respondents operate
> cannot use the program for which the rates were calculated.

Decision Memo 8; see also Def.'s Resp. 18 (explaining that here Commerce identified 92

countervailable subsidy programs that were examined in this review).   It then examined

the income tax programs and inferred that Kam Kiu paid no income taxes and thus took

full advantage of all such programs.   Decision Memo 8.  Next, Commerce considered all

programs other than those involving income tax rate reduction or exemption.   Id.   For

these programs Commerce explained its hierarchy:

> first . . . where available [it applied] the highest above de minimis subsidy
> rate calculated for an identical program from any segment of this
> proceeding[; next, it] . . . applied, where available, the highest above de
> minimis subsidy rate calculated for a similar program from any segment of
> this proceeding[, however,] [b]ecause the rates calculated in the underlying
> investigation were calculated for voluntary respondents, [it did] not us[e]
> any of those rates as AFA rates in this administrative review[; next it] . . . applied
> the highest non-de minimis rate calculated for the same or similar program
> (based on treatment of the benefit) in another PRC CVD proceeding[; next
> it] . . . applied the highest calculated subsidy rate for any program otherwise
> listed from any prior PRC CVD case, so long as the non-cooperating

companies conceivably could have used the program for which the rate was calculated.

Decision Memo 8-9.

Next, Commerce explains why the rates used are reliable and relevant.  It explains they are reliable because the rates used are "subsidy rates calculated in this review or other PRC CVD final determinations" and "the calculated rates were based on information about the same or similar programs."  Decision Memo 9.  Moreover, the programs are relevant because, "[f]or those programs for which the Department has found a program-type match . . . [it used] . . . the same or similar programs . . . [and] [f]or the programs for which there is no program-type match . . . [it used] . . . the highest calculated subsidy rate for any PRC program which the non-cooperative companies could receive a benefit . . . [which are] actual calculated CVD rates for a PRC program . . . ."  Id. at 10.  Commerce further explained that these rates were calculated for periods close to the POR.  Id.

Finally, Commerce specifically addressed Kam Kiu's argument that it was unreasonable to attribute location-specific subsidies to the company.  Decision Memo 62.  It explained

> [w]ith the exception of the company's mailing address, the record contains no information on the location of facilities owned by Taishan City Kam Kiu or facilities of any possible subsidiaries or other cross-owned affiliated companies. Although Taishan City Kam Kiu relies on the CIT's decision in *MacLean Fogg I* and *MacLean Fogg II* for the proposition that it would be unreasonable to assume that the all of the companies subject to the all others rate received subsidies in every region in China, importantly, in affirming the Department's determination not to calculate specific rates for each all others company based on the addresses of the companies, the CIT held: "Plaintiffs' reliance on the addresses provided in the Petition is unavailing because Commerce raises the reasonable concern that these addresses do not accurately convey locations of manufacturing facilities nor do[] they

account for potential cross-ownership." It is possible that Taishan City Kam Kiu or an affiliated company has facilities in the areas where the Department has found that subsidies are available. As such, because the Department has no knowledge as to Taishan City Kam Kiu's locations and/or cross ownership, the application of AFA for regional, provincial subsidy programs is warranted.

<u>Decision Memo</u> 62 (citation omitted).

Commerce must corroborate assumptions to the extent practicable, and while it has tried to corroborate the first assumption, it has not addressed the second assumption at all. Rather than corroborating programs with independent sources, Commerce addresses corroboration by meticulously detailing why each step in its AFA methodology leads to the selection of programs that are nonetheless probative, <u>i.e.</u>, reliable and relevant.  Commerce may very well apply its methodology, but the programs selected, and the application of all of those selections to Kam Kiu simultaneously, must still be corroborated to the extent practicable with independent sources reasonably at its disposal.  <u>See</u> 19 U.S.C. § 1677e(c).

Commerce's explanations do not address the overarching problem identified above, that Kam Kiu could conceivably benefit from all of the programs simultaneously. While it is true that Commerce's methodology does lead to the selection of programs which have some probative value, evidence reasonably at Commerce's disposal suggests that Kam Kiu could not have benefited from all of these programs at the same time.  Even if Kam Kiu's mailing address does not definitively establish Kam Kiu's location and cross-ownership, Commerce can use other information available on the record to corroborate whether Kam Kiu would be the type of company to benefit from subsidies in

locations throughout the PRC.   For example, Commerce has Kam Kiu's Q&V questionnaire response on the record.  While the court found Commerce did not abuse its discretion by disregarding the untimely response for purposes of identifying mandatory respondents, Commerce may wish to consider the Q&V response, in relation to other Q&V data, to corroborate.  See 19 U.S.C. § 1677e(c).  Further, Kam Kiu has participated in other administrative proceedings.[5]   Commerce can use information from those proceedings to corroborate, just as it uses information from other respondents in other proceedings in its adverse inference methodology. Commerce has also investigated both voluntary and mandatory respondents in the investigation and this review.  See 19 C.F.R. § 351.308(d) (explaining that among other things, "information obtained from interested parties during the investigation or review" are independent sources that Commerce uses to corroborate).  Commerce may wish to compare the ability of voluntary respondents to use various types of subsidies from various locations in its corroboration analysis even if it declines to use their rates in its adverse inference methodology.  If no respondent in the investigation or review benefitted from subsidies in all the locations throughout the PRC, it is not apparent to the court what in the record supports Commerce's finding that Kam

---

[5] For example, Plaintiff points to Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 30650 (Dep't Commerce May 26, 2011) (antidumping duty order). Pl.'s Reply 10.  According to Kam Kiu, the Antidumping Duty Order contains evidence that Kam Kiu has only one location.  Id.  "Since Commerce linked exporter and producer margins in the initial investigation, if Taishan City Kam Kiu had multiple affiliated producers in different locations in China, it would have had to report those producers in its Separate Rates application to get a valid separate antidumping rate and the other producers would have been reflected in the antidumping order itself."  Id.  Commerce may decide to look to this order on remand to determine whether it contains independent sources to corroborate.

Kiu could have.   It is not the court's role to say that particular information would corroborate Commerce's findings.   Nonetheless, it is the court's role to determine whether Commerce has acted reasonably.   Commerce can either attempt to corroborate Kam Kiu's ability to benefit from these programs simultaneously in the first instance, or can adjust its methodology as applied to Kam Kiu and corroborate its findings under its new methodology.

Commerce's methodology reasonably identifies subsidies from which Kam Kiu could have conceivably benefited but does not link the ability to benefit from all of these programs simultaneously to Kam Kiu.   Tellingly, Defendant states that the rate chosen "provided a reasonable estimate of the level of subsidization provided by the Chinese government."   Def.'s Resp. 20. However, Commerce calculates net countervailable subsidy rates based in part on the benefit conferred to individual exporters and producers. See 19 U.S.C. § 1677f-1(e); 19 U.S.C. § 1671(a); 19 U.S.C. § 1675 (a)(1)(A); 19 U.S.C. § 1677(5)(E), (6).  Further, countervailing duty cases are different from antidumping cases where Commerce assumes respondents, who do not rebut the presumption of government control, are a part of the country-wide entity.[6]   Here, Commerce has turned

---

[6] In the NME AD context, Commerce presumes that all commercial entities are controlled by the state unless they can show lack of control.  See Sigma Corp. v. United States, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).  Entities that do not rebut the presumption of state control receive the dumping rate assigned to the country-wide entity, often based on 19 U.S.C. § 1677e(b).  See e.g., Peer Bearing Co.-Changshan v. United States, 32 CIT 1307, 1312-13, 587 F. Supp. 2d 1319, 1326-28 (2008).   Thus, Commerce is required to corroborate the rate with respect to the country-wide entity rather than an individual company.  However, in countervailing duty cases Commerce does not make the same presumption of state control and thus must corroborate the rate applied to an individual respondent.

corroboration on its head by presuming that Kam Kiu availed itself of all subsidies provided by the Chinese government, and only eliminating programs Kam Kiu demonstrated it could not have conceivably used. <u>Decision Memo</u> 9.  As applied to Kam Kiu, this method was not consistent with Commerce's obligation to corroborate the rate assigned to Kam Kiu's "actual rate, albeit with some built-in increase intended as a deterrent to non-compliance."  <u>F. lli De Cecco</u>, 216 F.3d at 1032.

Commerce contends the rate has probative value and is corroborated to the extent practicable because it has not identified any independent information to disprove its rate. <u>See</u> <u>Decision Memo</u> 9, 62.  Commerce's discretion to adopt a methodological approach for establishing an adverse inference does not permit it to throw its hands in the air at the corroboration stage.  Here, its determination effectively disaggregates each rate applied to Kam Kiu and explains why each rate has probative value rather than explaining why Kam Kiu, or a company like Kam Kiu, could actually have received subsidies from such a broad swath of the PRC.  Commerce cannot satisfy its burden in this manner.   The burden of corroboration is an affirmative burden placed on Commerce, to temper its discretion in selecting information.  19 U.S.C. § 1677e(c).

While the Court of Appeals affirmed a rate established solely by a methodological approach in <u>Essar Steel</u>, that case presented a very different set of facts from this case. There, Commerce found, despite the respondent's attestations to the contrary, that the respondent had an operating production facility in Chhattisgarh, India. <u>Essar Steel</u>, 753 F.3d at 1370-71.  Commerce thus proceeded to apply an adverse inference that the respondent availed itself of subsidies offered by the state of Chhattisgarh.  <u>Id.</u> at 1372.

The Court of Appeals explained that the only respondent being investigated, the state government of Chhattisgarh, and the government of India, failed to cooperate and provide information regarding company specific benefits pursuant to the programs in question. Id. at 1374.  It further explained that there were no other independent sources of company specific benefits on the record.  Id.  Moreover, the Court of Appeals reviewed Commerce's methodology with regard to benefits received from the specific programs, not programs spanning throughout India.   Here, Commerce's methodology assumes Kam Kiu's ability to benefit from programs across China simultaneously and Commerce has information from which it could attempt to corroborate Kam Kiu's ability to use these programs simultaneously.

The lack of corroboration in this case leaves the court concerned that the rate it applied to Kam Kiu is punitive.  Commerce applied a rate of 121.22 % for the years 2010 and 2011 to Kam Kiu and the other uncooperative respondents.  See Final Results, at 107-108.  This rate is in stark contrast to the rates applied to the mandatory respondents for 2010 of 15.97% and 1.02% and for 2011 of 15.66% and 1.51%, rates which themselves carry adverse inferences.  See e.g., Decision Memo 10-11.  Commerce has not explained how this rate relates to Kam Kiu or why it is necessary to deter noncompliance.  Commerce chose the highest possible rate for each subsidy that Kam Kiu could conceivably have used.  Thus, the benefit assigned to Kam Kiu for each possible subsidy includes an adverse inference.  Additionally, inherent in Commerce's methodology of applying all conceivably used subsidies to Kam Kiu is another adverse inference.  This building of adverse inferences on top of each other to create a rate that

Commerce does not corroborate in the aggregate leaves the court with the impression that the rate is punitive.  Commerce's finding that the rate applied is a reasonably accurate estimate of Kam Kiu's actual countervailing duty rate albeit with some built-in increase to deter non-compliance, is not supported by substantial evidence.

Defendant also defends Commerce's use of the "Export Rebate for Mechanic, Electronic, and High-Tech Products" program in the AFA rate.  Defendant explains that although neither of the mandatory respondents used the program, one of the voluntary respondents in the investigation did and thus, in accordance with its methodology, Commerce properly included the program.  Def.'s Resp. at 23.  Moreover, because neither respondent in the review used the program, it looked at the same program in a different review, but did not use that rate because it was de minimis.  Id.  Then in accordance with its hierarchy it used a similar program from a prior review involving China.  Id. at 24.  Like the use of location specific subsidies from across China, Commerce has not corroborated the use of this program by Kam Kiu.  In order for Commerce to apply this subsidy to Kam Kiu, doing so must be based upon a reasonable reading of the record.  Commerce's duty to corroborate ensures that the rate is "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance."  F. lli De Cecco, 216 F.3d at 1032.  Evidence that mandatory respondents did not use the program detracts from Commerce's finding.  Without explaining how Kam Kiu could have availed itself of the benefits of this program, Commerce's finding is not supported by substantial evidence.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's determination is remanded for further consideration consistent with this opinion; and it is further,

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further,

**ORDERED** that Plaintiff shall have 30 days thereafter to file objections; and it is further,

**ORDERED** that Defendant and Defendant-Intervenor shall have 15 days thereafter to file responses.

   /s/ Claire R. Kelly
   Claire R. Kelly, Judge

Dated: March 20, 2015
      New York, NY